# UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| LISA BRADFORD,<br><br>　　Plaintiff,<br><br>v.<br><br>COMMISSIONER OF SOCIAL SECURITY,<br><br>　　Defendant. | Case No. 1:25-cv-00004-JLT-SAB<br><br>FINDINGS AND RECOMMENDATIONS RECOMMENDING REVERSING FINAL DECISION OF THE COMMISSIONER OF SOCIAL SECURITY AND REMANDING FOR FURTHER PROCEEDINGS<br><br>(ECF Nos. 11, 13) |

Plaintiff Lisa Bradford ("Plaintiff") seeks judicial review of a final decision of the Commissioner of Social Security ("Commissioner") denying her application for disability benefits pursuant to the Social Security Act. The matter was automatically referred to the undersigned for the preparation of findings and recommendations, Local Rule 302(c)(15), and it is currently before the Court on the parties' briefs, which were submitted without oral argument.

Plaintiff requests the decision of Commissioner be vacated and the case be remanded for further proceedings, arguing that the decision below was not supported by substantial evidence. Specifically, Plaintiff argues that the Administrative Law Judge ("ALJ") erred in its analysis of Plaintiff's subjective complaints and her activities of daily living; Plaintiff further argues that the ALJ's calculation of Plaintiff's residual functioning capacity was not supported by the record.

For the reasons explained herein, the Court will recommend reversing the final decision of the Commissioner and remanding for further proceedings.

1

**I.**

**BACKGROUND**

**A.     Procedural History**

On May 18, 2022, Plaintiff protectively filed a Title II application for a period of disability and disability benefits and a Title XVI application for supplemental security income, alleging disability beginning December 1, 2018.  (ECF No. 10, Administrative Record ("AR"), 84.)  Plaintiff's applications were initially denied on August 25, 2022, and denied upon reconsideration on November 8, 2022.  (Id.)  Plaintiff requested before a hearing before an ALJ.  On September 30, 2023, Plaintiff, represented by counsel, appeared for a hearing in front of an ALJ.  (Id.)  Plaintiff and vocation expert ("VE") Thomas Linvill testified.  (Id.)  On December 21, 2023, the ALJ issued a decision concluding that Plaintiff was not disabled within the meaning of the Social Security Act.  (AR 93.)  On October 29, 2024, the Appeals Council denied Plaintiff's request for review.  (AR 1-7.)

**B.     The ALJ's Findings of Fact and Conclusions of Law**

In the decision, the ALJ found that Plaintiff had met the insured status requirements through December 31, 2023, and that Plaintiff had not engaged in substantial gainful activity since December 1, 2018, the alleged disability onset date.  (AR 86.)  The ALJ found that Plaintiff had the following severe impairments: undifferentiated/mixed connective tissue disease (CTD); systemic lupus erythematosus (SLE); SLE/CTD overlap syndrome; migraine; status post transient ischemic attack (TIA); thyroid disorder; tinnitus and partial hearing loss, and obesity.  (AR 86-87.)  However, Plaintiff did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed in impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1.  (AR 87.)

After considering the entire record, the ALJ found that Plaintiff had the residual functional capacity ("RFC") to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b) except with the following limitations: occasional pushing or pulling with both arms; occasional pushing or pulling with both legs; occasional climbing of ramps or stairs; never climbing of ladders, ropes or scaffolds; occasional stooping; occasional kneeling; occasional crouching; and occasional

crawling. Plaintiff can work where there is no concentrated exposure to extreme heat and cold, wetness and humidity, or respiratory irritants. Plaintiff is capable of understanding and remembering instructions; and capable of performing simple and repetitive tasks, but not at a fast-paced rate, such as assembly line work. Plaintiff can be in a work environment with no more than a moderate noise level as defined in the Selected Characteristics of Occupations (SCO), and no bright lights. Occasionally is defined as occurring from very little up to one-third of the time, or a maximum of approximately 2 hours in an 8-hour workday. (AR 88.)

The ALJ then found that that Plaintiff was unable to perform any of her past relevant work, she was 36 years old on the alleged disability onset date, and she had at least a high school education. (AR 91.) The ALJ discussed that transferability of job skills was not material to the determination of disability because using the Medical-Vocational Rules as a framework supported a finding that Plaintiff was "not disabled," whether or not Plaintiff had transferable job skills. (Id.) Considering Plaintiff's age, education, work experience, and RFC, the ALJ found that there were jobs that existed in significant numbers in the national economy that Plaintiff could perform. (Id.) Accordingly, the ALJ concluded that Plaintiff had not been under disability, as defined by the Social Security Act, from December 18, 2018, through the date of the decision, December 21, 2023. (AR 92-93.)

Plaintiff sought timely review of the Commissioner's final decision in the federal courts. (ECF No. 1.) Thereafter, the parties filed their briefs on the matter.[1]

///

///

///

---

[1] On December 1, 2022, the Supplemental Rules for Social Security became effective. Rule 5 states, "[t]he action is presented for decision by the parties' briefs." Fed. R. Civ. P. Appx. Rule 5. The 2022 Advisory Committee noted that "Rule 5 states the procedure for presenting for decision on the merits a [42 U.S.C.] § 405(g) review action that is governed by the Supplemental Rules." Fed. R. Civ. P. Appx. Rule 5 advisory committee note 2022. Like an appeal, "the briefs present the action for decision on the merits. This procedure displaces summary judgment or such devices as a joint statement of facts as the means of review on the administrative record." Id. The 2022 Advisory Committee unambiguously clarified that "Rule 5 also displaces local rules or practices that are inconsistent with the simplified procedure established by these Supplemental Rules for treating the action as one for review on the administrative record." Id. Here, Plaintiff filed a motion for summary judgment, which the Court will construe as a brief in support of her position on whether the Court should affirm, modify, or reverse the decision of the Commissioner. 42 U.S.C. § 405(g).

## II.

## LEGAL STANDARD

### A.  The Disability Standard

To qualify for disability insurance benefits under the Social Security Act, a claimant must show she is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). The Social Security Regulations set out a five-step sequential evaluation process to be used in determining whether a claimant is disabled.  20 C.F.R. § 404.1520;[2]  Batson v. Comm'r of Soc. Sec. Admin., 359 F.3d 1190, 1194 (9th Cir. 2004).  The five steps in the sequential evaluation in assessing whether the claimant is disabled are:

> Step one: Is the claimant presently engaged in substantial gainful activity?  If so, the claimant is not disabled.  If not, proceed to step two.
>
> Step two: Is the claimant's alleged impairment sufficiently severe to limit his or her ability to work?  If so, proceed to step three.  If not, the claimant is not disabled.
>
> Step three: Does the claimant's impairment, or combination of impairments, meet or equal an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1?  If so, the claimant is disabled.  If not, proceed to step four.
>
> Step four: Does the claimant possess the residual functional capacity ("RFC") to perform his or her past relevant work?  If so, the claimant is not disabled.  If not, proceed to step five.
>
> Step five: Does the claimant's RFC, when considered with the claimant's age, education, and work experience, allow him or her to adjust to other work that exists in significant numbers in the national economy?  If so, the claimant is not disabled.  If not, the claimant is disabled.

Stout v. Comm'r, Soc. Sec. Admin., 454 F.3d 1050, 1052 (9th Cir. 2006). The burden of proof is on the claimant at steps one through four. Ford v. Saul, 950 F.3d 1141, 1148 (9th Cir. 2020). A claimant establishes a *prima facie* case of qualifying disability once she has carried the burden of proof from step one through step four.

---

[2] The regulations which apply to disability insurance benefits, 20 C.F.R. §§ 404.1501 et seq., and the regulations which apply to SSI benefits, 20 C.F.R. §§ 416.901 et seq., are generally the same for both types of benefits. Accordingly, while Plaintiff seeks only Social Security benefits under Title II in this case, to the extent cases cited herein may reference one or both sets of regulations, the Court notes these cases and regulations are applicable to the instant matter.

1    Before making the step four determination, the ALJ first must determine the claimant's
2 RFC. 20 C.F.R. § 416.920(e). The RFC is "the most [one] can still do despite [his or her]
3 limitations" and represents an assessment "based on all the relevant evidence." 20 C.F.R. §§
4 404.1545(a)(1), 416.945(a)(1). The RFC must consider all the claimant's impairments, including
5 those that are not severe. 20 C.F.R. §§ 416.920(e); 416.945(a)(2); Social Security Ruling
6 ("SSR") 96-8p, 1996 WL 374184 (July 2, 1996).[3] "[I]t is the responsibility of the ALJ, not the
7 claimant's physician, to determine residual functional capacity." Vertigan v. Halter, 260 F.3d
8 1044, 1049 (9th Cir. 2001); 20 C.F.R. §§ 404.1545(a)(1), 404.1546(c).

9    At step five, the burden shifts to the Commissioner, who must then show that there are a
10 significant number of jobs in the national economy that the claimant can perform given her RFC,
11 age, education, and work experience. 20 C.F.R. § 416.912(g); Lounsburry v. Barnhart, 468 F.3d
12 1111, 1114 (9th Cir. 2006). To do this, the ALJ can use either the Medical Vocational Guidelines
13 ("grids") or rely upon the testimony of a VE. See 20 C.F.R. § 404 Subpart P, Appendix 2;
14 Lounsburry, 468 F.3d at 1114; Osenbrock v. Apfel, 240 F.3d 1157, 1162 (9th Cir. 2001).
15 "Throughout the five-step evaluation, the ALJ 'is responsible for determining credibility,
16 resolving conflicts in medical testimony, and for resolving ambiguities.'" Ford, 950 F.3d at 1149,
17 quoting Andrews v. Shalala, 53 F.3d 1035, 1039 (9th Cir. 1995).

18   **B.   Standard of Review**

19   Congress has provided that an individual may obtain judicial review of any final decision
20 of the Commissioner of Social Security regarding entitlement to benefits. 42 U.S.C. § 405(g). In
21 determining whether to affirm, modify, or reverse an ALJ's decision, the Court reviews only
22 those issues raised by the party challenging the decision. See Lewis v. Apfel, 236 F.3d 503, 517
23 n.13 (9th Cir. 2001). Further, the Court's review of the Commissioner's decision is a limited one;
24 the Court may not disturb the Commissioner's final decision unless it is based on legal error or
25 the findings of fact are not supported by substantial evidence. 42 U.S.C. § 405(g); Reddick v.

---

[3] SSRs are "final opinions and orders and statements of policy and interpretations" issued by the Commissioner. 20 C.F.R. § 402.35(b)(1). While SSRs do not have the force of law, the Court gives the rulings deference "unless they are plainly erroneous or inconsistent with the Act or regulations." Han v. Bowen, 882 F.2d 1453, 1457 (9th Cir. 1989); see also Avenetti v. Barnhart, 456 F.3d 1122, 1124 (9th Cir. 2006).

1 Chater, 157 F.3d 715, 720 (9th Cir. 1998). "[T]he threshold for such evidentiary sufficiency is not high." Biestek v. Berryhill, 587 U.S. 97, 103 (2019). Rather, "[s]ubstantial evidence is more than a mere scintilla, and means only such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Stiffler v. O'Malley, 102 F.4th 1102, 1106 (9th Cir. 2024), quoting Ford, 950 F.3d at 1154. In other words, "[s]ubstantial evidence is relevant evidence which, considering the record as a whole, a reasonable person might accept as adequate to support a conclusion." Thomas v. Barnhart, 278 F.3d 947, 954 (9th Cir. 2002), quoting Flaten v. Sec'y of Health & Human Servs., 44 F.3d 1453, 1457 (9th Cir. 1995).

Should the ALJ err, the Court will not reverse where the error was harmless. Stout, 454 F.3d at 1055-56. "An error is harmless only if it is 'inconsequential to the ultimate nondisability determination.'" Leach v. Kijakazi, 70 F.4th 1251, 1255 (9th Cir. 2023), quoting Lambert v. Saul, 980 F.3d 1266, 1278 (9th Cir. 2020). The burden of showing that an error is not harmless "normally falls upon the party attacking the agency's determination." Molina v. Astrue, 674 F.3d 1104, 1111 (9th Cir. 2012), quoting Shinseki v. Sanders, 556 U.S. 396, 409 (2009).

Finally, "a reviewing court must consider the entire record as a whole and may not affirm simply by isolating a specific quantum of supporting evidence." Hill v. Astrue, 698 F.3d 1153, 1159 (9th Cir. 2012), quoting Robbins v. Soc. Sec. Admin., 466 F.3d 880, 882 (9th Cir. 2006). Nor may the Court affirm the ALJ on a ground upon which he or she did not rely; rather, the Court may review only the reasons stated by the ALJ in his decision. Orn v. Astrue, 495 F.3d 625, 630 (9th Cir. 2007); see also Connett v. Barnhart, 340 F.3d 871, 874 (9th Cir. 2003). It is not this Court's function to second guess the ALJ's conclusions and substitute the Court's judgment for the ALJ's; rather, if the evidence "is susceptible to more than one rational interpretation, it is the ALJ's conclusion that must be upheld." Ford, 950 F.3d at 1154, quoting Burch v. Barnhart, 400 F.3d 676, 679 (9th Cir. 2005).

### III.

### DISCUSSION AND ANALYSIS

Plaintiff argues that the ALJ erred in three related ways. First, Plaintiff argues that the ALJ failed to properly analyze Plaintiff's subjective symptom testimony. (ECF No. 11, pp. 3-7.)

Second, Plaintiff contends that the ALJ erred by failing to discuss Plaintiff's activities of daily living ("ADLs"), which Plaintiff argues support her credibility with regard to her symptom testimony. (Id. at pp. 7-8.) Third, Plaintiff argues that the ALJ erred in its calculation of Plaintiff's RFC by not including limitations that are clearly supported by the record. (Id. at pp. 8-9.) The Commissioner opposes, arguing that substantial evidence supports the ALJ's decision. (ECF No. 13.) In the Court's view, Plaintiff's arguments really collapse into one, and with that, the Court agrees with Plaintiff.

### A.   Plaintiff's Subjective Complaints

Plaintiff takes two issues with the ALJ's credibility determination of Plaintiff's subjective complaints. First, Plaintiff asserts that the ALJ gave only a general summary of the evidence and did not delineate what evidence undermined Plaintiff's alleged limitations. Second, Plaintiff argues that the ALJ erred by describing Plaintiff's treatment as conservative. Because the ALJ's summary did not identify key parts of Plaintiff's testimony regarding her subjective complaints, and because the ALJ failed to identify medical evidence that it found discredited the testimony it did identify, either in part or in full, the ALJ erred. Furthermore, the ALJ's analysis of Plaintiff's testimony as conservative treatment was not supported by substantial evidence.

"The ALJ is responsible for determining credibility, resolving conflicts in medical testimony, and for resolving ambiguities." Garrison v. Colvin, 759 F.3d 995, 1010 (9th Cir. 2014), quoting Andrews v. Shalala, 53 F.3d 1035, 1039 (9th Cir.1995). As relevant here, where the ALJ "determines that a claimant . . . is not malingering and has provided objective medical evidence of an underlying impairment which might reasonably produce the pain or other symptoms she alleges, the ALJ may reject the claimant's testimony about the severity of those symptoms only by providing specific, clear, and convincing reasons for doing so." Lambert, 980 F.3d at 1277, quoting Brown-Hunter v. Colvin, 806 F.3d 487, 488-89 (9th Cir. 2015). "Ultimately, the 'clear and convincing' standard requires an ALJ to show his work." Smartt v. Kijakazi, 53 F.4th 489, 499 (9th Cir. 2022). An ALJ must show their work by "identify[ing] the testimony [from a claimant] she or he finds not to be credible and . . . explain[ing] what evidence undermines that testimony." Lambert, 980 F.3d at 1277, quoting Treichler v. Comm. of Soc. Sec. Admin., 775

F.3d 1090, 1102 (9th Cir. 2014).  Boilerplate statements and general summaries of the evidence, without more, are not enough.  Id. at 1277-78.  That said, an ALJ is not required "to perform a line-by-line exegesis of the claimant's testimony" or "draft dissertations when denying benefits." Id. at 1277.

While "an ALJ cannot insist on clear medical evidence to support each part of a claimant's subjective pain testimony when there is no objective testimony evincing otherwise, . . . [w]hen objective medical evidence in the record is *inconsistent* with the claimant's subjective testimony, the ALJ may indeed weigh it as undercutting such testimony."  Smartt, 53 F.4th at 498 (emphasis in original).  Indeed, "[c]ontradiction with the medical record is a sufficient basis for rejecting the claimant's subjective testimony."  Carmickle v. Commissioner, Social Sec. Admin., 533 F.3d 1155, 1161 (9th Cir. 2008).  "The standard isn't whether [a] court is convinced, but instead whether the ALJ's rationale is clear enough that it has the power to convince."  Smartt, 53 F4th at 499.

The ALJ summarized Plaintiff's subjective complaints as follows:

> The claimant testified to the following: She lives with her 3 children, ages 19, 18, 17, and her mother.  She completed 11 grade, and a GED.  She also took some college classes and has a medical assistant degree.  She last worked in 2018.  She was already on light duty because she was sick.  She gets lupus flare ups about every 3 weeks to a month.  She spends 2-3 weeks of a month with severe lupus flare ups and experiences migraines. The Botox treatments helps with the migraines, but she still experiences them.  She experiences about 5 bad days in a week.  She has about 6-7 medical appointments a month.

(AR 89.)  Thereafter, the ALJ at made the following relevant statements related to Plaintiff's subjective testimony:

> Treatment notes, objective diagnostic studies, clinical findings and medical opinions support the residual functional capacity determination, and account for the subjective symptoms documented in the [sic] her longitudinal treatment notes.  The exertional, postural, environmental and mental limitations of the residual functional capacity are based on the claimant's symptoms and limitations secondary to her impairments. . . . The claimant reported that she had increased joint pain, difficulty thinking, brain fog and migraines three times a week. . . . The claimant reported she has migraines three times a week, experiences 5 bad days a week and has severe SLE flare ups 2-3 weeks in a month.

1 (Id.)

2   Beyond this, the ALJ did not otherwise identify the testimony from Plaintiff regarding her
3 subjective symptoms that the ALJ found to not to be credible or explain what evidence undermined
4 that testimony.  See Lambert, 980 F.3d at 1277.  To that end, the Court is compelled to outline
5 Plaintiff's hearing testimony regarding her subjective complaints.

6   During the hearing, the ALJ asked Plaintiff what help she needed (usually from her
7 children), to which Plaintiff responded that, "[h]onestly it can vary from anywhere from helping
8 me get dressed, to taking a shower at times.  It depends on the day of the week, honestly, Your
9 Honor."  (AR 318.)  Plaintiff continued, "I have really bad days like everything – like my joints are
10 swollen, and everything hurts, or I'm vomiting.  Like there's times when my daughter has to go in
11 there and help me take a shower, or pull up my pants because my hands are too swollen, and I
12 can't do it myself."  (Id.)  The ALJ asked if Plaintiff was describing complications from her lupus,
13 and Plaintiff explained that, "my joints hurt so bad a I [sic] can't – I can't even maneuver my
14 fingers at times just to pull up my own pants because the pain is just too much for me.  There's
15 time when my daughter has to actually go into the shower with me, and help me wash my hair and
16 my body because I can't do it myself.  There's times when she has to come in and comb my hair
17 because my shoulder hurt[s] to where I can't – I cannot lift the hairbrush up over my head."  (AR
18 318-19.)

19   The ALJ then inquired how often Plaintiff had flare-ups, and Plaintiff stated that, "I would
20 say on average, probably about three weeks a month."  (AR 319.)  "Like, I might get a week and
21 half where I'm okay, and then it – just like I'll repeat – like I'm back to square one, where I'm
22 going into flare-up, and the first probably week and a half of that is miserable, and then it kind of
23 starts to subside a little bit."  (Id.)  "[T]he first two weeks is where I can't even take the pain, and I
24 – like it prevents me from showering myself.  It prevents me from driving a lot of the time."  (Id.)

25   Plaintiff described that she "vomit[s] constantly at times.  I – and it leads to severe pain."
26 (AR 320.)  The ALJ then asked Plaintiff where the pain was on Plaintiff's body, and she responded
27 that it was "mainly my joints . . . in my hands, my knees – my hands, my knees, my shoulder, my
28 feet.  Like my ankles."  (AR 321.)  "It's kind of like the equivalent of having the worst flu you've

1  ever had in your life and having the body aches with that.  Like the joint pain.  It's like that.  That's
2  pretty much what it's like to live with lupus." (Id.)  Plaintiff clarified that this is the pain she was
3  speaking about that occurs "about three weeks out of the month." (Id.)

4     The ALJ then turned to Plaintiff's migraines, asking whether Plaintiff knew if her
5  migraines were connected to her lupus. (Id.)  Plaintiff responded that, "they're not sure.  They
6  kind of think it's due to the lupus because when I'm in a flare-up migraines get worse.  And then,
7  like I have – I get them so badly that they're blinding.  I can't – I can't be in a room with anything
8  on.  I can't – I can't have the TV on, I can't put the lights on, and I'm on the sink anyway the
9  majority of the time vomiting." (Id.)  Plaintiff explained that when she is having a flare-up, it
10 makes her migraines worse, "[l]ike, I can go a little while with not having them, and then I'll end
11 up having a flare which makes them full force.  But I don't know if it's the flare-ups that's causing
12 the migraines or vice versa." (AR 322.)

13    Plaintiff testified that around mid-December 2020, she began treatment with Botox, which
14 "does help.  However, like I said, when I'm in a flare – and this is what my neurologist is coming –
15 we're kind of coming to the conclusion is, it helps when – I guess when I'm not having a flare-up,
16 but when I'm having a flare-up – I mean, it does help because I'm not – I'm not as bad as it was,
17 but – I don't' know how to describe it.  Like I'm – the migraines aren't as bad.  Like I'm not
18 vomiting from morning to night because of the headaches, but I might vomit once or twice.  If that
19 makes sense." (Id.)  Plaintiff described that though Botox had helped initially to reduce her
20 migraines during flare-ups to "about four now when I'm having a flare-up, . . . [the migraines are]
21 kind of coming back again, like full force again, and I don't know . . . [my doctor] tends to think
22 it's just my flare-ups are getting worse again." (Id.)

23    Plaintiff testified that she will take "Tylenol and Advil at the same time but the only thing
24 that kind of helps with it is if I'm able to go to sleep.  Half the time I'm so busy vomiting, it makes
25 it really hard to try to like do that." (AR 323.)  Moreover, Plaintiff described that certain
26 medications she was taking "make me sick to my stomach, to be honest." (AR 324.)  The ALJ
27 inquired if Plaintiff knew if vomiting was a side effect from her medication, and Plaintiff
28 responded that, "It's a side effect of the medication and then it's a side effect, like I said, of the

10

1  migraines, both.  Because when I get them, like it just instantly – like yesterday, after I took the
2  medications.  I have really – like really bad stomach cramping when I take them as well." (Id.)
3  Plaintiff testified that none of her treatments have given her relief for a long period of time.  (AR
4  325.)

5        While Plaintiff had not been prescribed a cane or walker, Plaintiff testified that on her good
6  days, "I can walk around independently . . . but they're there for times when – I'll be really honest,
7  I've had to walk to my shower, or my daughter has to come in and hold – observe me so I – when I
8  close my – so I can use her to try to get into the shower, or get up out of bed to go to the
9  bathroom." (Id.)  Plaintiff explained that on average she had "at least five bad days and two good
10 days" in a week.  (AR 326.)  Furthermore, on her bad days, Plaintiff testified that "I usually just
11 lay in bed because the pain is so unbelievable, and I feel miserable."

12       Plaintiff stated that she had no hobbies and that she relied on giving a list to her children
13 for grocery shopping.  (AR 326-27.)  Plaintiff testified that she could stand "anywhere from 15 to
14 30 minutes" before needing to take a break and sit and vice versa.  (AR 327.)  Even on good days,
15 Plaintiff described that her walking was limited.  (Id.)  Plaintiff stated that on a good day she can
16 lift a gallon of milk but not on a bad day.  (AR 328.)  Plaintiff testified that she drops things a lot
17 and is usually unable to cook for herself, relying again on her children.  (Id.)  On a good day, she
18 might try sweeping the floor but not on a bad day.  (Id.)  Plaintiff does not really help with laundry.
19 (Id.)  Plaintiff testified that she has a hard time watching television because it hurts her eyes, and
20 she normally just lays in bed.  (AR 329.)

21       Thus, as should be apparent, the ALJ's summary did not include mention of the severity
22 and breadth of Plaintiff's subjective symptoms.  Nor did the ALJ acknowledge the of the
23 limitations on Plaintiff's ADLs.  To be sure, the ALJ needs to only identify testimony from
24 Plaintiff that the ALJ finds to not be credible, Treichler, 775 F.3d at 1102, but there are various
25 statements from Plaintiff regarding severity and intensity that the ALJ did not address.  For
26 example, Plaintiff mentioned that she constantly battles with vomiting and even more so during
27 flare-ups.  Plaintiff described extreme joint pain that often hindered her ability to dress, bathe,
28 brush her hair, or drive without assistance from her children.  Plaintiff testified that her hands get

11

so swollen that she cannot bathe herself. Thus, the Court is left without the ability to review the ALJ's reasoning for ostensibly rejecting this testimony from Plaintiff. Tomassetti, 533 F.3d at 1041-42 (The "ALJ is the final arbiter with respect to resolving ambiguities in the medical evidence."). Therefore, the ALJ's analysis of Plaintiff's subjective symptom testimony is not supported by substantial evidence.

Furthermore, even assuming the ALJ did reasonably summarize Plaintiff's testimony, the Court finds that the ALJ's analysis regarding the rejection of the testimony the ALJ did identify to be lacking. Again, the ALJ is required to "explain what evidence undermines that testimony." Treichler, 775, F.3d at 1102. Yet, what appears to follow the ALJ's summary of testimony is a summary of the medical evidence (AR 89-90), which the Ninth Circuit has squarely held to be inadequate. Brown-Huner, 806 F.3d at 494 ("[P]roviding a summary of medical evidence . . . is not the same as providing clear and convincing reasons for finding the claimant's symptom testimony not credible.").

The only real assessment seemingly undercutting Plaintiff's credibility was the ALJ's finding that Plaintiff "received conservative treatment, which improved her symptoms." (AR 89.) While "conservative treatment" is sufficient to discount a claimant's testimony regarding severity of an impairment," Parra v. Astrue, 481 F.3d 742, 750-51 (9th Cir. 2007), the ALJ generally stated that this treatment improved "her symptoms," apparently applying this to all her symptoms (but the Court cannot be sure). And upon review of the cited medical record, the ALJ has not even supported that Plaintiff's received only conservative treatment.

The first record the ALJ cited to is AR 1139 (Exh. 8F/9), which is a patient history from Bakersfield Family Medical Center dated February 24, 2022. The history states that Plaintiff reported her joint pain, which was worse in her hands due to a lupus flare-up. Plaintiff also reported a fever and was not feeling well. The history also noted that Plaintiff had chronic abdominal pain.

The ALJ then cited to AR 1165-68 (Exh. 9F/9-12), which is a medical record from the

1 UCLA Medical Center dated May 17, 2022.[4] Plaintiff reported that she had been "more sore" recently, had bronchitis a month ago, stopped all meds, and then began to wheeze. Then her primary doctor increased her prednisone to 40 mg for a week for the wheezing. Thus, Plaintiff reported that she is better from that. Much of this medical record supports Plaintiff's testimony regarding vomiting and nausea ebbing and flowing, as well as describing how Plaintiff must adjust her medications when she has flare-ups. The record also captures how Plaintiff's hands and feet swell up at times. This record also references Plaintiff's biopsy from a gastrointestinal doctor, as well as Plaintiff being scheduled for MRIs

Next, the ALJ cited to AR 2463 (Exh. 14F/128), which is a telemedicine summary from November 29, 2022, where it was listed that Plaintiff has lupus with connective tissue disease overlap syndrome. The summary notes that Plaintiff has had a 2-year history with ANA, positive antimitochondrial antibody, positive thyroid peroxidase, fatigue, arthritis, rashes, ulcers, abdominal pain, Raynaud's syndrome, swelling, lupus panniculitis (confirmed with biopsy). Moreover, it noted that Plaintiff had gone off certain medications during the Covid-19 pandemic but has continued taking them. Plaintiff had symptoms again after a viral illness. The note states that Plaintiff should try and taper her prednisone down from 25 mg and then once improved move on to another medication.

The ALJ also cited to AR 3375 (Exh. 15F/13), which is a copy of the February 24, 2022 patient history from Bakersfield Family Medical Center. (Compare AR 1139 with AR 3375.)

The ALJ then stated the following to support its position that Plaintiff received and improved with conservative treatment:

> The ultrasound studies of the thyroid from 2018 to 2020 revealed enlarged thyroid and findings consistent with thyroiditis. (Exhibit 4F/19-22) Treatment notes contain entries of thyromegaly and hypothyroid, but the claimant was asymptomatic. (Exhibit 4F, 5F/28) The December 2022 ultrasound study of the thyroid was unremarkable. (Exhibit 18F/17) The claimant received medication and Botox injections, and treatment notes indicate that the claimant's migraine was stable and she reported 80% reduction

---

[4] The Court is unsure how to interpret this record, which merely lists over and over "last visit." Though, it appears it might be a running list of visits, there are no dates that correspond to each "last visit." In any event, because the ALJ relied upon this record as demonstrating conservative treatment, the Court addresses its substance as best it can.

13

>in migraine in June 2021 and significant improvement with Botox therapy. (Exhibit 5F/49, 6F/6, 10F/23, 43, 13F/39)

(AR 89-90.) These records primarily deal with Plaintiff's thyroid, which the Court fails to see the connection between those records and a conservative treatment record overall, much less improvement regarding Plaintiff's alleged symptoms. To be sure, the ALJ identified that Plaintiff sought and received medication and Botox injections for her migraines, including a report by Plaintiff that there had been an 80% reduction in her migraines in 2021 with the Botox therapy. (AR 90, citing AR 876.)[5] However, the Court was unable to glean from the records, or otherwise from the ALJ, that Botox injections for migraines are considered "conservative treatment." It might be true that Botox is conservative treatment, but neither the ALJ's opinion nor the records allow the Court to objectively make that connection.

Finally, the Court notes that the ALJ stated that state consultative examiner "document[ed] primarily conservative treatment and clinical findings," but the ALJ did not discuss what she meant by that. Thus, the Court reviewed the records. The Court observers that H. Samplay, M.D., briefly summarized Plaintiff's medical records. These summaries are primarily abbreviations capturing physical examinations, treatments, assessments, and other notable findings. For example, in February 2020, Plaintiff was assess as having "lupus, hyperthyroid, migraine, DDD, vitamin D deficient, [and] chronic fatigue." (AR 346, 363.) On March 16, 2020, Plaintiff assessed as "mixed connective tissue, thrombocytosis chronic, smoker, enlarged thyroid." (AR 347; 363.) In Decmember 2020, Plaintiff was treated for her "migraine, therapeutic injections, preventative medicine." (AR 347; 364.) Other evidence demonstrated, for example, assessments of acute renal failure, diagnosis of "colonic polyp, cecal extrinsic compression, small internal hemorrhoids," as well as noting Plaintiff's Botox injections. (AR 347-48; 364.) The Court highlights that Dr. Samplay did not describe Plaintiff's treatment as conservative. Therefore, the Court is again left unsure if whether the summaries Dr. Samplay generated can support the ALJ's assessment that Plaintiff received only or even primarily conservative treatment.

---

[5] However, Plaintiff also described that she was behind on her Botox and thus had been experiencing more migraines and flares. (AR 876.)

The Court makes the following observations. In the majority of these records, it was not necessarily noted whether Plaintiff was improving or maintaining her symptoms with conservative treatment. Nor did the ALJ define what she meant by conservative treatment in her opinion. Finally, the Court is left questioning regarding whether Botox is conservative treatment. The Ninth Circuit has affirmed an ALJ's credibility determination where the ALJ observed that the claimant's symptoms were being treated by over-the-counter pain medication and characterizing that as "conservative treatment." Parra, 481 F.3d at 750-51. But the Court finds the ALJ has neither defined by what she meant as conservative treatment or directed the Court to records that clarify as much. For these reasons, the ALJ's analysis of conservative treatment as undercutting the credibly of the testimony it did identify from Plaintiff is not supported by substantial evidence.[6]

For both of these points, the Commissioner either reiterates the medical records the ALJ relied upon or asks the Court to look outside of what the ALJ cited, which is not the function of judicial review. See Orn, 495 F.3d at 630; Treichler, 775 F.3d at 1102 (The "grounds upon which an administrative order must be judged are those upon which the record discloses that its action was based."). Thus, the Commissioner's arguments are unavailing.

The Court stresses that the larger problem with the ALJ's opinion here is that it is missing the "because." In other words, the ALJ seemingly discredited some portion of Plaintiff's testimony regarding her subjective symptoms, but the ALJ did not provide reasoning. Similarly, the ALJ did not support her assessment of Plaintiff sought only conservative treatment either by providing reasoning or citing to appropriate records in support. Thus, the ALJ's rationale was not "clear enough that it has the power to convince." Smartt, 53 F4th at 499.

### B.    Harmless Error and Remand

Even if the ALJ has erred, the Court may not reverse the ALJ's decision where the error is harmless. Stout, 454 F.3d at 1055-56. An error is harmless where it is "inconsequential to the

---

[6] The Court notes that ALJs must consider a claimant's "activities of daily living," 20 C.F.R. § 404.1529, but many of the cases in this area of the law involve an ALJ making a negative credibility determination regarding a claimant based on his or her ADLs, which is a permissible inference. Burch v. Barnhart, 400 F.3d 676, 681 (9th Cir. 2005). Here, it does not appear that the ALJ really contended with Plaintiff's ADLs. However, Plaintiff has not identified any precedent that this alone would be error, and given the conclusions above, the Court declines to research this claim *sua sponte*.

1 [ALJ's] ultimate nondisability determinations." Tommasetti v. Astrue, 533 F.3d 1035, 1038 (9th
2 Cir. 2008) (quotation and citation omitted).  The burden of showing that an error is not harmless
3 "normally falls upon the party attacking the agency's determination." Shinseki v. Sanders, 556
4 U.S. 396, 409 (2009).

5      Though the Court has previously noted that Ninth Circuit has held that failure to adequately
6 assess a plaintiff's testimony regarding subjective complaints is reversable error, the Court notes
7 the underlying reasoning for this.  To start, without the ALJ providing reasoning for rejecting a
8 claimant's testimony, the Court is unable to conduct a meaningful judicial review. See Treichler,
9 775F.3d at 1102 ("Nor is the error harmless.").  Furthermore, without a sufficient analysis, the
10 Court is likewise unable to assess whether the ALJ's RFC is supported by substantial evidence
11 because whether or not the ALJ credited a claimant's testimony directly bears on that decision.
12 See id. at 1103 (declining the agency's invitation to use the RFC and summarized medical
13 evidence in order to back engineer the ALJ's credibility determination).  Thus, this analysis
14 thereby addresses Plaintiff's third and final argument regarding the RFC in the case at bar.

15      Last, the Court will recommend that the district judge remand this action, as opposed to
16 Plaintiff's suggestion to impose benefits.  Remand for an award of benefits only in "rare
17 circumstances," Moisa v. Barnhart, 367 F.3d 882, 886 (9th Cir. 2004), "where no useful purpose
18 would be served by further administrative proceedings and the record has been thoroughly
19 developed." Hill v. Astrue, 698 F.3d 1153, 1162 (9th Cir.2012).  Here, the Court finds further
20 proceedings would be useful in order to allow an ALJ to craft a credibility determination of
21 Plaintiff's testimony regarding subjective symptoms that is supported by substantial evidence.

22 **IV.**
23 **CONCLUSION AND RECOMMENDATION**

24      Accordingly, IT IS HEREBY RECOMMENDED that the final decision of the
25 Commissioner of Social Security be REVERSED, judgment be entered in favor of Plaintiff Lisa
26 Bradford and against Defendant Commissioner of Social Security, and this matter be
27 REMANDED for further proceedings.
28      These findings and recommendations are submitted to the district judge assigned to this

action, pursuant to 28 U.S.C. § 636(b)(1)(B) and this Court's Local Rule 304.  Within fourteen (14) days of service of this recommendation, any party may file written objections to these findings and recommendations with the court and serve a copy on all parties.  Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendations."  The district judge will review the magistrate judge's findings and recommendations pursuant to 28 U.S.C. § 636(b)(1)(C).  The parties are advised that failure to file objections within the specified time may result in the waiver of rights on appeal.  Wilkerson v. Wheeler, 772 F.3d 834, 839 (9th Cir. 2014), citing Baxter v. Sullivan, 923 F.2d 1391, 1394 (9th Cir. 1991).

IT IS SO ORDERED.

Dated: __**January 6, 2026**__

STANLEY A. BOONE
United States Magistrate Judge